# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KAREN M. WEAVER,                                    Case No. 1:18-cv-641
     Plaintiff,                                 Barrett, J.
                                                    Litkovitz, M.J.

     vs.


COMMISSIONER OF                                     **REPORT AND**
SOCIAL SECURITY,                                    **RECOMMENDATION**
     Defendant.

Plaintiff Karen M. Weaver brings this action pro se pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB").   This matter is before the Court on plaintiff's statement of errors (Doc. 13), the Commissioner's response in opposition (Doc. 15), and plaintiff's reply (Doc. 17).

## I.  Procedural Background

Plaintiff protectively filed her application for DIB on November 4, 2014, alleging disability since May 5, 2012,[1] due to a head injury, brain surgery, and brain tumor.   The application was denied initially and upon reconsideration.   Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ") Peter Jamison. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing on October 20, 2017.   On January 30, 2018, the ALJ issued a decision denying plaintiff's DIB application. This decision became the final decision of the Commissioner when the Appeals Council denied review on July 10, 2018.

---

[1] Plaintiff amended her alleged disability onset date to August 15, 2014 at the hearing.   (Tr. 34).

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

2

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy.   *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B.    The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The [plaintiff] has not engaged in substantial gainful activity since August 15, 2014, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

3. The [plaintiff] has the following severe impairments: brain disorder and sleep apnea (20 CFR 404.1520(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity [("RFC")] to perform a full range of work at all exertional levels but with the following nonexertional limitations: The [plaintiff] can never climb ladders or scaffolds; and she can occasionally balance. The [plaintiff] should avoid all exposure to unprotected heights and hazardous, moving, mechanical parts.   The [plaintiff] can occasionally operate a motor vehicle; and she should avoid all exposure to humid/wet working conditions. Further, the [plaintiff] should avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants; and she should avoid all exposure to extreme heat.   The [plaintiff] can perform simple, routine, repetitive tasks, but not at a production-rate pace.   The [plaintiff] can make simple, work-related decisions.   The [plaintiff] can interact with supervisors occasionally; and she can never interact with co-workers and the public.   In addition, the [plaintiff] is able to tolerate ordinary and routine changes in the work setting and duties.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[2]

7. The [plaintiff] was born [in] . . . 1963 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from May 5, 2012, through the date of [the ALJ's] decision (20 CFR 404.1520(g)).

(Tr. 16-24).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[2]  Plaintiff's past relevant work was as a data entry wireless phone worker and appointment clerk, both sedentary, semi-skilled positions, and in retail sales, which was light, semi-skilled work.   (Tr. 23, 61-62).

[3]   The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled jobs such as sorter, with 90,000 jobs in the national economy; packer, with 150,000 jobs in the national economy; and cleaner, with 100,000 jobs in the national economy.   (Tr. 23-24, 63-64).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.  Medical evidence of record

#### i.  Surgery

In May 2012, plaintiff presented to the hospital with a mild headache, vertigo, and generalized weakness. (Tr. 312). A CT scan revealed a mass at the "foramen of Monro," a passage in the brain, with mild left ventricular dilatation consistent with a colloid cyst. (*Id.*). Plaintiff was transferred to University Hospital for definitive neurosurgical evaluation and treatment. (*Id.*). An MRI confirmed the colloid cyst. (Tr. 312, 314-15). On May 4, 2012, plaintiff underwent a right frontal craniotomy for tumor resection. (Tr. 312, 320). Post-

5

operative imaging showed "a good amount of resection without significant deficits." (Tr. 312). Plaintiff "tolerated the procedure well from a neurological standpoint" and was transitioned to a regular diet and a regimen of oral pain medication. (*Id*.).

Plaintiff underwent an outpatient speech language pathology evaluation on June 14, 2012. (Tr. 324-25). The results disclosed that plaintiff had moderate-to-severe short-term memory deficit but all other cognitive and linguistic skills appeared to be within normal limits. (Tr. 324). Plaintiff's rehabilitation potential was assessed as "good." (*Id*.). Plaintiff was to continue functional communication cognitive linguistic therapy with targeted compensatory memory strategies. (*Id*.). A neuropsychology assessment performed on July 27, 2012, disclosed that plaintiff had borderline impairment in auditory memory and naming to confrontation; mild to moderate bilateral slowing of fine motor speed; and mild to moderate anxiety. (*See* Tr. 414).

Plaintiff subsequently returned to work and was discharged from therapy on August 23, 2012, with "all [long-term goals] met." (Tr. 326). Plaintiff reported that she was using compensatory strategies at work and was completing all work tasks effectively. (Tr. 327). The therapist reported that no revision in compensatory strategies was required at that time. (*Id*.). Plaintiff was advised to contact the speech and language pathology department if any further strategy revision was needed as her work hours increased. (*Id*.).

### ii. *Dr. George Jewell, Ph.D.*

Dr. Jewell evaluated plaintiff twice over a two-week period in October and November 2013 on referral from plaintiff's neurosurgeon, Dr. John Tew, M.D. (Tr. 411). A battery of psychological tests were administered as part of the evaluation. (Tr. 412-13). Plaintiff complained that she continued to make "occasional small mistakes at work," but she had not

6

been reprimanded by her supervisor for forgetting work tasks.   (Tr. 411).   She reported some

ongoing problems with both physical and cognitive fatigue.   (*Id*.).   Plaintiff's cousin, who

provided collateral information, felt that plaintiff may have regressed in terms of short-term

memory very recently in the context of increased work stressors.   (*Id*.).   Plaintiff felt that her

work stress distracted her at times, and she sometimes repeated herself and forgot conversations.

(*Id*.).   She did not typically forget appointments, medication, or bills, and her family did not

assist her with these matters.   (*Id*.).   She wrote more notes than she had previously.   (*Id*.).   She

did not return to driving post-surgery for reasons that were not clear.   Plaintiff reported no

problems with long-term memory, decision-making, problem-solving, spatial navigation, and

receptive or expressive language.   (*Id.*).

Dr. Jewell did not observe any abnormalities in plaintiff's behavior.   (Tr. 412).   In the

area of emotional functioning, Dr. Jewell noted that plaintiff "endorsed a mild degree" of

depression and anxiety symptoms, with "very few affective features of depression" and

"primarily somatic symptoms which may or not be due to depression such as loss of energy,

fatigue, and low libido."   (Tr. 413-14).   He reported that she also endorsed "a broad spectrum

of cognitive, physiological, and affective symptoms of anxiety."   (Tr. 414).

Dr. Jewell summarized his findings as follows: Plaintiff reported "additional cognitive

recovery" since her last neuropsychological assessment but some continued difficulties with

short-term memory, concentration, mental fatigue, and time perception.   (*Id*.).   She felt that her

work stress sometimes distracted her.   She reported "no significant difficulties with instrumental

[activities of daily living]."   (*Id*.).   She did not feel she was significantly depressed, but she

reported an increase in work stress, continued family stressors, and continued mild symptoms of

worry and anxiety recently.   (*Id*.).   The assessment disclosed no decline since her prior

7

neuropsychology assessment, and her fine motor speed and memory functioning had improved to a small degree.  (*Id.*).  Dr. Jewell concluded that:

> Overall, Ms. Weaver appears to have had a good cognitive recovery from her colloid cyst and associated surgery with very subtle deficits remaining only in isolated areas of functioning.   Based on her history and test results, it seems likely that the functional effects of what are objectively very subtle cognitive deficits are being magnified in the work setting by increased stress and anxiety symptoms.

(*Id.*).  He diagnosed plaintiff with borderline impairment in naming to confrontation, mild variability in auditory memory, and mild slowing of fine motor speed, which presumably were residual symptoms of a colloid cyst to which anxiety and fatigue contributed.  (*Id.*).  Dr. Jewell did not find any deficits which indicated plaintiff would have difficulty with driving or independently managing her own affairs.  (Tr. 415).  He recommended that plaintiff undergo a trial of antidepressant medication with anxiolytic properties or that she participate in psychotherapy to treat anxiety which was not new but may have worsened recently due to situational factors.

### iii.   Dr. Jacqueline Kinard, Ph.D.

The record reflects that plaintiff attended counseling with Dr. Kinard from late December 2013 until April 2014 due to memory problems and work-related issues.   (Tr. 576-83).   Dr. Kinard diagnosed plaintiff with adjustment disorder with anxiety and depression and some panic attacks.  (Tr. 583).   In April 2014, Dr. Kinard noted plaintiff had experienced no significant changes but was more stable than when she first presented for counseling.   (Tr. 578).

### iv.   Dr. Amador Delamerced, M.D.

Plaintiff established care with Dr. Delamerced in April 2014 after she terminated care with another physician.   (Tr. 388-90).   At her initial visit, she reported she had undergone brain

surgery in 2012 and complained of severe fatigue, forgetfulness, "perception off," memory loss, cognitive issues, severe insomnia, inability to remember a conversation, severe headaches/dizziness, periodic joint pain, and a feeling of heaviness in her muscles. (Tr. 388). Plaintiff complained primarily of an intermittent but "chronic (short-term memory loss, anxiety) problem" that waxed and waned, with the current episode having started more than one year earlier. Plaintiff reported that the symptoms were aggravated by stress. She had tried "rest (memory exercises) for the symptoms" but had not obtained any relief. (*Id*.). The review of symptoms was negative for all physical symptoms and positive for memory loss and nervousness/anxiety. (Tr. 389). The objective physical findings and psychiatric findings were normal. (Tr. 390). Dr. Delamerced assessed plaintiff with "[m]emory loss, cognitive impairment-[status/post] brain surgery. (*Id*.). Dr. Delamerced recommended memory exercises, diet/exercise, and smoking cessation counseling. (*Id*.).

At subsequent visits, physical examination findings generally showed normal range of motion in the extremities; plaintiff's orientation was normal; and plaintiff displayed normal behavior, judgment, and thought content. (Tr. 371-391, 416-71). In June 2014, plaintiff complained of mild, recurrent headaches with the current episode having begun more than one year earlier; fatigue; insomnia; and memory loss. (Tr. 385). The diagnosis was mild cognitive impairment, obesity, and smoking syndrome. (Tr. 386-87). In August 2014, the records reflect that plaintiff had a history of anxiety and obesity and a short-term memory problem. (Tr. 382). Plaintiff had tried rest for her symptoms, which had provided "mild relief." (*Id*.). She was assessed with obesity, mild cognitive impairment, and anxiety. (Tr. 383). In November 2014, Dr. Delamerced diagnosed plaintiff with "[c]ognitive deficits" and recommended "[m]ental health exercises" and a "neuro" consult. (Tr. 380). In March 2015, Dr. Delamerced diagnosed

9

plaintiff with memory loss, obesity, and smoking syndrome.   (Tr. 377).   He recommended diet, exercise, and smoking cessation counseling and wrote that plaintiff was "Unable to work - worsening memory."   (*Id*.).   In June 2015, Dr. Delamerced diagnosed plaintiff with "mild cognitive impairment," a rash, and right ankle pain/tendonitis.   (Tr. 373).   In September 2015, the diagnoses were mild cognitive impairment and hyperlipidemia.   (Tr. 459).   In December 2015, plaintiff presented with depression, worsening joint pain in the shoulders and knees, worsening memory loss, and a gait problem ("imbalance/fallen").   (Tr. 452).   She was diagnosed with a mild cognitive impairment, anxiety, headache, and head trauma.   (Tr. 454). In February 2016, plaintiff presented with anxiety, headache, memory loss (mild cognitive impairment), trauma based on a CT scan of the head, side effects from Celexa, a painful and bruised right shoulder/leg, and a request for a psychiatric referral.   (Tr. 447).   She was diagnosed with a cognitive defect, a history of brain surgery, anxiety, depression, and fatigue. (Tr. 449).   In April 2016, plaintiff presented with anxiety/depression, fatigue, a mild cognitive impairment, side effects from Wellbutrin, and a large, painful bruise behind the left knee.   (Tr. 442).   She requested a referral to a neurologist.   (*Id*.).   She was diagnosed with hypertension, anxiety, insomnia, and depression.   (Tr. 445).   In September 2018, plaintiff presented paperwork to be completed.   (Tr. 438).   Dr. Delamerced assessed her with fatigue, mood disorder, anxiety, and memory loss for which he prescribed "diet and exercise."   (Tr. 440).   He noted that plaintiff was "unemployable."   (*Id*.).   In October and December 2016, plaintiff presented with acute right knee pain followed by intermittent right leg pain that was relieved with medication.   (Tr. 434, 430).   In April 2017, plaintiff was diagnosed with hypertension, anxiety, and a worsening cognitive impairment.   (Tr. 425).   In July 2017, plaintiff presented with paperwork and was assessed with GERD, cognitive impairment, anxiety, and weakness.

10

(Tr. 419-21).   Her physical examination findings were normal.   (*Id.*).   Plaintiff's behavior, judgment, and thought content were normal, and she was oriented to person, place, and time. (*Id.*).   The notes state that plaintiff was "unemployable; can't focus, can't handle stress.   Weak since brain surgery 5 years ago."   (Tr. 422).

On July 17, 2017, Dr. Delamerced, completed a Neuro-Cognitive Disorder Medical Source Statement in which he indicated that he saw plaintiff every two months.   (Tr. 404-09). He diagnosed plaintiff with a cognitive impairment and anxiety, and he indicated that her prognosis was "fair."   (Tr. 404).   He checked the following "residual symptoms" from a list of symptoms on the form: balance problems, weakness, fatigue, vertigo/dizziness, headaches, difficulty remembering, and difficulty solving problems.   The clinical findings were "forgetful" and "can't focus."   (*Id.*).   Dr. Delamerced opined that plaintiff was unable to meet competitive standards in all categories of mental abilities and aptitudes needed to do unskilled, semi-skilled, and particular types of jobs.   (Tr. 405-06).   He also indicated on a checklist that plaintiff found it stressful to perform the work demands involved in making decisions, working with other people, dealing with the public, being criticized by supervisors, and knowing that work is supervised, and she had "no opportunity for learning new things."   (Tr. 406).   He opined that emotional factors contributed to the severity of plaintiff's symptoms and functional limitations. (*Id.*).   He also opined that plaintiff could walk 1-2 city blocks without rest, sit for 10 minutes at a time and less than 2 hours total in an 8-hour work day; stand 5 minutes at a time; and stand/walk less than 2 hours total in an 8-hour work day.   She would need to shift positions from sitting, standing, or walking at will; she would need to take breaks every hour for 15 minutes and sit quietly; she could lift/carry up to 10 pounds occasionally; and she could rarely lift/carry up to 50 pounds, twist, stoop, crouch/squat, and climb ladders/stairs.   (Tr. 407).   She was limited to

using her fingers, hands, and arms for 60% to 70% of the work day.  (*Id*.).  Dr. Delamerced found she was incapable of low stress work.  (*Id*.).  Dr. Delamerced concluded that plaintiff would be off task 25% or more of the workday and would miss four or more days of work per month.  (Tr. 408-09).

v.  *Dr. David Chiappone, Ph.D.*

Dr. Chiappone performed a consultative psychological examination of plaintiff on March 25, 2015, and interpreted psychology tests administered by a psychology aide.  (Tr. 339-48). Plaintiff complained of problems with her memory, concentration, and focus stemming from her brain surgery.  (Tr. 340).  She reported she had left her most recent job at Cincinnati Bell activating equipment, doing billing, and shipping after eight years because the division closed. (*Id*.).  She stated that toward the end of her work career, she started making mistakes and forgot to bill out information.  (*Id*.).  She reported that she related to the general public "[p]retty well." (Tr. 341).  Plaintiff was not currently taking any prescribed medication, and she reported that she had never taken psychiatric medication or been psychiatrically hospitalized.  (Tr. 341-42). She had received some mental health treatment to help her deal with anxiety and depression. (Tr. 342).  Plaintiff reported that on a typical day, she woke up early and watched the news, smoked a cigarette, made breakfast, and did chores, including washing dishes by hand.  (Tr. 344).  She reported she cleaned the floors occasionally; did laundry every couple of weeks; grocery shopped once a week; attended to her hygiene but sometimes did not have the energy to do it; watched television, read information online, and played games on the internet, although she had some difficulty focusing on and remembering what she read or watched; had phone contact with family members; had friends who visited her; and drove but could not locate her car in a parking lot if it was not by a post.  (*Id*.).

12

On mental status examination, Dr. Chiappone found that plaintiff's hygiene was adequate, she did not show pain or unusual motor behaviors, and she was cooperative.   (Tr. 342).   She displayed no abnormalities in flow of conversation and thought or of mental content during the session.   (*Id*.).   She did not appear to be depressed and denied that she was.   (Tr. 342-43).   She reported she sometimes felt anxious, but she did not show behavioral signs of anxiety during the session.   (Tr. 343).   She denied having panic attacks.   (*Id*.).   Plaintiff was oriented in all spheres, she was able to understand and follow directions, her work pace was slow, and she put forth adequate effort and persistence.   (*Id*.).   Her concentration, attention, and memories were below average, and her intellectual functioning appeared to be in the low-average range.   (*Id*.).   Her fund of knowledge was in the average range, she was able to abstract verbal similarities, and she could perform basic math problems.   (Tr. 344).   Dr. Chiappone found that plaintiff had adequate insight and judgment and was able to make decisions about the future, manage her daily living situation, understand and comply with treatment, and manage funds. (*Id*.).

Plaintiff endorsed symptoms which suggested to Dr. Chiappone that she had a cognitive disorder following her tumor removal.   (Tr. 345).   She complained of memory deficits and reported she had burned food in the past and had forgotten to pay some bills.   (Tr. 346).   She watched television and played games on the computer but had trouble focusing and remembering the particulars.   (Tr. 346).   IQ testing revealed a full-scale IQ of 82, which is in the low-average range, and a working memory IQ of 71, which is in the borderline range.   (Tr. 345-46).

Dr. Chiappone suggested a diagnosis of "Unspecified Neurocognitive Disorder."   (Tr. 347).   He opined plaintiff "may have some difficulty" remembering information based on her struggle with memory items on the mental status examination and her test scores; her self-

reported symptoms considered together with her reports that she knows how to do chores and drove occasionally; the adequacy of her memories for history-taking in the interview; and her slow work pace.  (Tr. 346).  Dr. Chiappone opined that plaintiff would have "difficulty" maintaining attention and concentration based on her slow pace in the mental status examination; her ability to focus on only 3 digits backwards and 4-digit span sequences; her reported difficulty focusing when watching television or accessing the internet; her ability to focus on basic chores; her report that her pace was adequate when working; her report that her work has never been disrupted by mental health issues; and her ability to follow the conversation during the evaluation.  (Tr. 346-47).

Dr. Chiappone opined that plaintiff "may have difficulty" relating to co-workers and supervisors in a work setting because she reported having less patience and being moodier than she used to be, although she related adequately in the evaluation, was cooperative and polite, and reportedly interacted with her family and had visits from a friend.   (Tr. 347).

Finally, Dr. Chiappone opined that plaintiff would have "difficulty" dealing with stress on a job, noting that she reportedly had seen a psychologist to help her deal with stress, her intellectual functioning was in the low-average range, and she has a cognitive disorder that would make it difficult for her to deal with stress.  (*Id.*).

           *vi.   Dr. Martin Fritzhand, M.D.*

Dr. Fritzhand examined plaintiff for disability purposes on April 17, 2015.  (Tr. 349-55).  Plaintiff's chief complaint was, "probably I don't have any energy.   I'm in bed 80% of the time.  I think it's from my surgery."  (Tr. 349).   Plaintiff reported that she had not required any follow-up hospitalization but had suffered from a "[l]ack of energy ever since and [her] short-

term memory is not as good." (*Id.*). She reported she had occasional dizziness and headaches. (*Id.*). Plaintiff reported she had never been treated for depression. (*Id.*).

On examination, plaintiff ambulated with a normal gait; she was comfortable in the sitting and supine positions; her memory, ability to relate, appearance, and orientation were good; and her intellectual functioning was normal. (Tr. 350). Her neurological evaluation was normal. Dr. Fritzhand found plaintiff had normal motor strength and range of motion throughout. (Tr. 352-55). Dr. Fritzhand assessed plaintiff with a history of craniotomy with excision of colloid cyst; history of "lack of energy"; and exogenous obesity. (Tr. 350). Dr. Fritzhand opined that plaintiff would be capable of performing a "moderate amount" of sitting, ambulating, standing, bending, pushing, pulling, lifting, and carrying heavy objects. (*Id.*). She displayed no difficulty reaching, grasping, or handling objects.

### vii. Dr. Arthur Hughes, M.D.

Plaintiff consulted with Dr. Hughes in June 2017 on referral from Dr. Delamerced "for memory and confusion," which she complained had been problematic since her surgery. (Tr. 571). She told Dr. Hughes she occasionally confuses Tuesday with Saturday since the surgery. Plaintiff reported sleeping poorly, typically waking up around 4:00 a.m. and falling asleep around 7:00 p.m. or later, and typically sleeping for about three hours. (*Id.*). She was sleepy during the day and had to nap. (*Id.*). She had a CPAP machine, but she used it irregularly because it was uncomfortable and she had not seen a sleep doctor since 2013. (*Id.*).

On physical examination, plaintiff exhibited normal speech and mentation. Her cranial nerves were normal; there was no weakness of the upper or lower extremities; reflexes were normal; and gait was normal. (Tr. 573). Dr. Hughes assessed a mild cognitive impairment, which is a post-operative complication from previous colloid cyst surgery; and partially-treated

15

obstructive sleep apnea. (*Id.*). Dr. Hughes counseled plaintiff on smoking cessation and recommended that her thyroid function be checked. (*Id.*). Dr. Hughes also opined that "the ill-fitting" CPAP device was preventing plaintiff from treating her sleep apnea, and she should visit the sleep clinic again and get a mask that works properly for her. (*Id.*). It was his opinion that "[t]he incompletely treated sleep apnea can be a significant factor in causing her memory difficulty." (*Id.*).

*viii.   State Agency reviewing medical sources*

In April and May 2015, state agency psychologists Dr. Leslie Rudy, Ph.D., and Dr. Robyn Murry-Hoffman, Ph.D., reviewed the medical record and concluded that plaintiff is able to carry out simple 1-2 step tasks in a setting without demands for fast pace or high production. She is able to interact on an occasional and superficial basis with familiar others in a nonpublic setting. She is able to adapt to occasional changes in a relatively static setting. (Tr. 80-82, 95-97).

After reviewing the file in April 2015, state agency physician Dr. Abraham Mikalov, M.D., found that plaintiff has no "severe" physical impairment and no physical limitations based on the objective findings of the record. (Tr. 78). Dr. Gail Mutchler, M.D., reviewed plaintiff's file upon reconsideration in September 2015 and affirmed Dr. Mikalov's assessment. (Tr. 92-93).

**E.  Specific Errors**

In her statement of errors, plaintiff alleges that the ALJ erred by (1) failing to give appropriate weight to the treating physicians' opinions, and (2) posing a hypothetical question to the vocational expert which did not accurately describe her physical and emotional limitations. (Doc. 13). Plaintiff contends that the findings of each of the physicians who have seen her are

consistent with the findings of her treating physician, Dr. Delamerced, who has treated plaintiff since 2014 and has seen her every two to three months.   (*Id*. at 3-4).

### 1.   Weight to the treating physicians' opinions

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight.   Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ."   *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544.   The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone."   *Rogers*, 486 F.3d at 242.

A treating source's medical opinion must be given controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record[.]"   20 C.F.R. § 404.1527(c)(2); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).   If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining what weight to give the opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source.   *Wilson*, 378 F.3d at 544.   *See also Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. § 404.1527(c)) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4)).   In addition, an ALJ must "give good reasons in [the] notice of determination or decision for the weight [given to the

claimant's] treating source's medical opinion."   20 C.F.R. § 404.1527(c)(2).   The ALJ's

reasons must be "supported by the evidence in the case record, and must be sufficiently specific

to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight."   *Gayheart*, 710 F.3d at 376 (citing

Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5).   This requirement serves a two-fold purpose: (1)

it helps a claimant to understand the disposition of her case, especially "where a claimant knows

that h[er] physician has deemed h[er] disabled," and (2) it "permits meaningful review of the

ALJ's application of the [treating-source] rule."   *Wilson*, 378 F.3d at 544.

   Opinions from non-treating and non-examining sources are never assessed for

"controlling weight."   *Gayheart*, 710 F.3d at 375.   Generally, an opinion from a medical source

who has examined a claimant is given more weight than the opinion of a source who has not

performed an examination.   *Id.* (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1)).   If a treating

physician's opinion is not given controlling weight, opinions from examining and non-examining

sources are weighed based on the examining relationship or lack thereof, specialization,

consistency, and supportability.   *Id.* at 376 (citing 20 C.F.R. § 404.1527(c)).   Other factors

"which tend to support or contradict the opinion" may be considered in assessing any type of

medical opinion.   *Id.* (quoting 20 C.F.R. § 404.1527(c)(6)).   "In appropriate circumstances,

opinions from State agency medical . . . consultants . . . may be entitled to greater weight than

the opinions of treating or examining sources."   *Blakley*, 581 F.3d at 409.

   In his decision, the ALJ evaluated and weighed the assessments of plaintiff's physical

and mental functioning.   (Tr. 14-24).   The ALJ did not give controlling or deferential weight to

the opinion of Dr. Delamerced but assigned his opinion only "some" weight.   (Tr. 22).   The

ALJ recognized that Dr. Delamerced was a treating source, but the ALJ found his opinions were

18

inconsistent with both the "limited physical treatment" plaintiff received; the "unremarkable physical examinations" of record; and the results of her post-surgery neuropsychology evaluation in October and November 2013, which showed that plaintiff appeared to have had "a good cognitive recovery from her colloid cyst and associated surgery with very subtle deficits remaining only in isolated areas of functioning."   (Tr. 22-23, citing Tr. 411-14).

Instead, the ALJ gave "significant weight" to the opinion of neuropsychologist Dr. Jewell (Tr. 23, citing Tr. 411-15) and the opinions of state agency reviewing psychologists Drs. Rudy and Murry-Hoffman (Tr. 22, citing Tr. 71-85, 87-100).   Dr. Jewell evaluated plaintiff and found only mild to borderline impairment.   (Tr. 411-15).   The non-examining physicians found that plaintiff had some mental limitations consistent with her history of right frontal craniotomy with subsequent mild neurocognitive disorder.   (Tr. 71-85, 87-100).   The ALJ gave "some" weight to the March 2015 consultative psychological evaluation of Dr. Chiappone.   (Tr. 22, citing Tr. 339-348).   The ALJ found that Dr. Chiappone was an examining source whose opinions were consistent with his examination findings, but his opinions failed to take into account subsequent evidence that showed only a mild neurocognitive impairment.   (Tr. 22).   The ALJ also gave only "some" weight to the opinions of consultative examining physician Dr. Fritzhand (*Id.*, citing Tr. 349-55) and non-examining physicians Drs. Mikalov and Mutchler (*Id.*, citing Tr. 71-85, 87-100).   The ALJ found that Dr. Fritzhand's findings were somewhat vague, and he did not assess any specific functional limitations.   (Tr. 22).   The ALJ concluded that the non-examining physicians' assessment of no exertional limitations was "consistent with the unremarkable physical examinations and limited treatment in the record," but it did not take into account the significant evidence of sleep apnea which subsequently became available.   (*Id.*, citing Tr. 71-85, 87-100).

19

Plaintiff argues that the ALJ erred by rejecting her treating physician's opinions that she is "unemployable" and disabled because his findings are consistent with the findings and opinions of the other examining and treating medical sources of record.   (Doc. 13 at 3-4). Plaintiff alleges that all of the treating and examining medical sources agree she suffers from a cognitive disorder, anxiety, and depression, and each of these medical sources have found that it would be "very difficult" for her to "handle any amount of stress" from any type of work.   (*Id.* at 4).   Plaintiff asserts she also has trouble remembering and focusing.   (*Id.*).   Plaintiff notes that Dr. Kinnard diagnosed her with adjustment disorder with anxiety and depression and some panic attacks in December 2013.   (*Id.*, citing Tr. 583).   Plaintiff further notes that Dr. Chiappone diagnosed her with an unspecified neurocognitive disorder and opined that she "would have difficulty" dealing with stress on a job.   (*Id.*, citing Tr. 347).   Plaintiff alleges these findings are consistent with her diagnosed short-term memory loss due to her 2012 colloid cyst and hydrocephalus surgery (*Id.* at 2, citing Tr. 314), and with the numerous additional findings in Dr. Delamerced's Neuro-Cognitive Disorder Medical Source Statement.   (*Id.* at 2). Plaintiff notes that according to Dr. Delamerced, she has trouble remembering; she cannot sit or stand for long periods of time; she has trouble focusing and concentrating; and she is incapable of even low stress work and cannot tolerate any level of stress involved in making decisions, completing tasks, working with other people, dealing with the public, accepting criticism from supervisors, and knowing that work is supervised.   (*Id.* at 3-4, citing Tr. 404-09).   Plaintiff also points to Dr. Delamerced's findings that she has balance problems, weakness, fatigue, dizziness, headaches, difficulty remembering, and difficulty solving problems; she is unable to learn new things; she would have to take breaks at least every hour; and she would miss at least four days

20

of work each month.  (*Id*.).  In addition, plaintiff asserts that Dr. Delamerced assessed her as

"unemployable" on September 18, 2016.  (*Id*. at 3, citing Tr. 440).

The ALJ did not err by giving Dr. Delamerced's opinions only "some weight."  The

evidence of record substantially supports the ALJ's decision to discount the treating physician's

opinions.  First, the ALJ was not bound to accept Dr. Delamerced's conclusory opinions that

plaintiff was "unemployable," which Dr. Delamerced cryptically noted in the September 2016

and July 2017 treatment notes.  (Tr. 440, 422).  An ALJ is not required to accept a physician's

conclusion that his patient is disabled.  20 C.F.R. § 404.1527(d)(1)(3).  Whether a person is

disabled within the meaning of the Social Security Act is an issue reserved to the Commissioner,

and a treating physician's opinion that his patient is disabled is not entitled to deference.  20

C.F.R. § 404.1527(d).  *See Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004)

("The determination of disability is ultimately the prerogative of the Commissioner, not the

treating physician.") (citation and brackets omitted).  A physician's opinion that plaintiff could

not work is not a "medical opinion," i.e., an opinion "about the nature and severity of an

individual's impairment(s)."  SSR 96-2p.  It is an opinion regarding whether plaintiff is

disabled, which is an issue reserved to the Commissioner.  "[N]o special significance will be

given to opinions of disability, even if they come from a treating physician."  *LaRiccia v.

Commr. of Soc. Sec.*, 549 F. App'x 377, 385 n.5 (6th Cir. 2013) (quoting *Bass v. McMahon*, 499

F.3d 506, 511 (6th Cir. 2007) (internal quotations omitted).

Second, the ALJ did not err by failing to credit plaintiff's treating physician's opinions

simply because other treating and examining medical sources rendered similar medical

diagnoses.  "[A] diagnosis, in and of itself, is not conclusive evidence of disability because it

does not reflect the limitations, if any, that it may impose upon an individual."  *Dillon v. Astrue*,

No. 1:09-cv-896, 2011 WL 900987, *4 (S.D. Ohio Feb. 14, 2011) (Report and

Recommendation), *adopted sub nom., Dillon v. Comm'r of Soc. Sec.*, 2011 WL 901789 (S.D.

Ohio Mar. 14, 2011) (citing *Young v. Sec'y of Health and Human Servs.,* 925 F.2d 146, 151 (6th

Cir. 1990)).   Here, although the mental health providers agreed with Dr. Delamerced's diagnosis

of a cognitive impairment, their opinion varied widely as to the functional limitations imposed

by plaintiff's impairment.   Thus, the ALJ was not bound to adopt Dr. Delamerced's opinion and

find that plaintiff's cognitive impairment was totally debilitating simply because other medical

sources diagnosed her with the same impairment.

    To the contrary, the ALJ relied on substantial evidence that he reasonably found was

inconsistent with Dr. Delamerced's opinion of complete disability to discount the treating

physician's opinion.   First, Dr. Delamerced's opinion was inconsistent with his unremarkable

physical and mental examination findings and treating recommendations.   In his assessment, Dr.

Delamerced diagnosed plaintiff with a "cognitive impairment" and anxiety.   (Tr. 404).   He did

not diagnose any chronic physical impairments.   Physical examination findings were

consistently normal and included normal range of motion and no edema or tenderness throughout

plaintiff's treatment with Dr. Delamerced.   In addition, Dr. Delamerced's opinion that plaintiff

suffered from debilitating mental limitations was inconsistent with his psychiatric findings,

which were also consistently normal.   Plaintiff was oriented to person place and time; her mood,

affect, and behavior were normal; and judgment and thought content were normal.   Dr.

Delamerced's opinion was likewise inconsistent with the insubstantial treatment

recommendations Dr. Delamerced made.   Dr. Delamerced made few treatment

recommendations other than "diet," "exercise," and smoking cessation.   (*See*, e.g., Tr. 373, 377,

387, 425, 429, 433, 440, 449, 454).   Dr. Delamerced only occasionally recommended treatments

such stress counseling or "memory" or "mental health" exercises, but there appears to have been no follow-up on these recommendations.   (Tr. 380, 383, 390).

Despite the lack of abnormal exam findings and specific treatment recommendations, Dr. Delamerced reported in his July 2017 Medical Source Statement that plaintiff suffered from extreme and totally debilitating mental and physical limitations.   (Tr. 404-409).   Dr. Delamerced opined that plaintiff lacked each of the mental abilities and aptitudes required to perform any type of work activity.   (Tr. 405-06).   Dr. Delamerced also inexplicably determined that plaintiff could sit for only 10 minutes at one time, stand for 5 minutes at one time, sit for less than 2 hours total in an 8-hour day, and stand/walk for less than two hours total; she would need to take breaks and sit quietly for 15 minutes every hour; and she could only occasionally lift 10 pounds, rarely perform postural activities, and use her hand/fingers/arms for various activities only 60% to 70% of an 8-hour workday.   (Tr. 406-08).   Finally, Dr. Delamerced opined, without providing a basis for his opinion, that plaintiff was likely to be absent from work more than four days per month as a result of her impairments or treatment.   (Tr. 409).   The ALJ reasonably determined that these extreme limitations assessed by Dr. Delamerced were not consistent with the absence of abnormal physical and mental examination findings and treatment recommendations in Dr. Delamerced's treatment notes.

Second, the ALJ properly relied on inconsistencies in Dr. Delamerced's opinion and the post-surgery evaluation performed by neuropsychologist Dr. Jewell to find the treating physician's opinion is not substantially supported by the medical evidence.   (Tr. 22-23, citing Tr. 411-15).   Based on the results of his October-November 2013 evaluation, Dr. Jewell opined that plaintiff appeared to have had "a good cognitive recovery from her colloid cyst and associated surgery with very subtle deficits remaining only in isolated areas of functioning."

23

(Tr. 414).   Dr. Jewell's diagnostic impression was "[b]orderline impairment in naming to confrontation, mild variability in auditory memory, and mild slowing of fine motor speed," presumably stemming from her colloid cyst and exacerbated by anxiety and fatigue, and mild anxiety associated with work and personal stressors consistent with an adjustment disorder.   (Tr. 414).   His only treatment recommendation was therapy to address plaintiff's anxiety.   (Tr. 415).   Dr. Jewell found no deficits which indicated that plaintiff would have any problems driving or independently handling her own affairs.   (*Id*.).   The ALJ did not err by discounting Dr. Delamerced's opinion of debilitating limitations in the face of the neuropsychologist's inconsistent findings and by crediting Dr. Jewell's opinion, which was well-supported by a clinical interview with plaintiff; collateral information provided by plaintiff's cousin; review of the medical records; Dr. Jewell's behavioral observations of plaintiff; and the results of a battery of tests designed to assess plaintiff's functioning.   (Tr. 411-15).

Third, the ALJ reasonably relied on inconsistencies between Dr. Delamerced's assessment of functional limitations and the findings of the other medical providers, each of whom made findings which fell far short of the debilitating functional limitations assessed by Dr. Delamerced.   Whereas Dr. Delamerced assessed extreme physical limitations, consultative examining physician Dr. Fritzhand did not make any abnormal physical examination findings in April 2015.   (Tr. 349-55).   The state agency reviewing physicians found that plaintiff had no "severe" physical impairments, which the ALJ rejected only to the extent they failed to account for plaintiff's sleep apnea.   (Tr. 78, 92-93).   Consultative examining psychologist Dr. Chiappone opined that plaintiff "may" or would have difficulty in different work-related areas, but he did not indicate that her mental limitations were work-preclusive.   (Tr. 339-348).   The state agency reviewing psychologists opined that plaintiff is able to carry out simple 1-2 step

24

tasks in a setting without demands for fast pace or high production; she is able to interact on an occasional and superficial basis with familiar others in a nonpublic setting; and she is able to adapt to occasional changes in a relatively static setting.  (Tr. 81-82, 96-97).  The ALJ's decision to give Dr. Delamerced's opinion discounted weight is supported by the assessments of the examining and non-examining psychologists and physicians, none of whom assessed extreme and debilitating functional limitations similar to those found by plaintiff's treating physician.

Finally, the ALJ properly considered and accounted for the medical and other evidence of record which is consistent with, and supports, Dr. Delamerced's finding that plaintiff suffers from a "cognitive impairment."   The ALJ found at step three of the sequential evaluation process that plaintiff's impairments include a "brain disorder."  (Tr. 16).  The ALJ accommodated this impairment by formulating an RFC that restricted plaintiff to "simple, routine, repetitive tasks, but not at a production-rate pace"; "simple, work-related decisions"; "interact[ing] with supervisors occasionally"; "never interact[ing] with co-workers and the public"; and "ordinary and routine changes in the work setting and duties."  (Tr. 18).  Plaintiff has not identified additional restrictions imposed by her cognitive impairment which are supported by the medical evidence and which the ALJ failed to incorporate into the RFC.

Accordingly, the ALJ did not err in weighing the opinions of the medical sources and declining to credit Dr. Delamerced's opinion.   The ALJ thoroughly considered the evidence of record and weighed the conflicting opinions as required under the regulations.   The ALJ reasonably determined that although Dr. Delamerced is a treating physician, his opinion is not substantially supported by the medical evidence of record, it is not consistent with his own treatment notes and recommendations, and it is inconsistent with the findings and opinions of the

other medical sources.   The ALJ's decision to give the treating physician's opinion discounted weight is substantially supported by the evidence.

Plaintiff's first assignment of error should be overruled.

### 2.   Hypothetical posed to the VE

Plaintiff next argues that the ALJ erred at the last step of the disability analysis set out in 20 C.F.R. § 404.1520.   For this step, the burden of proof shifts to the government to show "by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (internal quotation marks omitted).   "[S]ubstantial evidence may be produced through reliance on the testimony of a vocational expert [] in response to a hypothetical question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Id*. at 512-13 (internal quotation marks omitted).   A hypothetical is inaccurate when it fails to include a specific limitation found by the ALJ.   *See id*. at 516-17; s*ee also Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001) ("A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments.").

Here, plaintiff contends that the hypothetical question that the ALJ posed to the VE did not accurately portray her physical and mental impairments because it did not properly consider the opinions of the treating or examining physicians.   (Doc. 13 at 5).   Plaintiff alleges that the ALJ failed to include limitations assessed by her treating physician, Dr. Delamerced, including being off task at least 20% of the workday; missing four days of work per month; and the need to take an unscheduled break for 15 minutes every hour.   (Doc. 17 at 1-2).   But the ALJ was not required to include these limitations in the hypothetical to the VE.   The ALJ discounted these

limitations assessed by Dr. Delamerced on the ground they were not supported by the record. For the reasons explained in connection with plaintiff's first assignment of error, the ALJ's finding is substantially supported by the evidence.   The ALJ did not err by relying on a hypothetical question that omitted limitations assessed by Dr. Delamerced.

Plaintiff's second assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **AFFIRMED** and this case be terminated on the Court's docket.


Date: 11/26/2019               s/ Karen L. Litkovitz
                               Karen L. Litkovitz
                               United States Magistrate Judge

27

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KAREN M. WEAVER,                                    Case No. 1:18-cv-641
       Plaintiff,                                Barrett, J.
                                           Litkovitz, M.J.

        vs.

COMMISSIONER OF
SOCIAL SECURITY,
       Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.   Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.   If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.   A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.   Failure to make objections in accordance with this procedure may forfeit rights on appeal.   *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).